**PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.**
(four cases).

(District Court, S. D. New York. September 28, 1914.)

Nos. 2—9, 2—33, 2—149, and 3—37.

1. STREET RAILROADS (§ 49*)—LEASE—CONSTRUCTION.

A provision in a lease of a street railroad system, requiring the lessee, "upon the expiration or earlier termination of this lease (to) deliver up the said demised railroads and other property and all additions thereto in good order and repair," binds it, where it has replaced rails or other parts of the roadway with heavier rails or more expensive parts, to return the structure as thus improved in good order and repair, but, where it has not made such betterments before the termination of the lease, the obligation is merely to keep the existing type of structure in such condition.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

2. STREET RAILROADS (§ 49*)—LEASE—LIABILITY OF LESSEE—COVENANT TO RETURN PROPERTY IN GOOD ORDER AND REPAIR—"GOOD ORDER AND REPAIR."

Such lease having been terminated by the insolvency of the lessee and the appointment of receivers for both lessee and lessor, who operated the roads for the latter for four years or more, where there was evidence that, at the time of the receivership, a considerable portion of the lines needed new rails to place the roadway in good condition and repair, although, owing to the financial condition of the lessee, the old rails were not being replaced, the fact that the lines could be operated, and that

the rails were not at once replaced by the receivers, but the work was continued through three or four years as funds and conditions permitted, does not warrant a finding that the tracks and roadway were in "good order and repair," within the meaning of the lease, at the time of its termination, nor a limitation of the liability of the lessee thereunder to the cost of such replacements as were made within any fixed time after the receivership.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*

For other definitions, see Words and Phrases, First and Second Series, Good Order and Condition.]

**3. STREET RAILROADS (§ 49*)—LEASE—COVENANT TO RETURN PROPERTY IN GOOD ORDER AND REPAIR.**

Under a covenant, in a lease of street railroad property, to deliver up the same upon the expiration or earlier termination of the lease, with all additions thereto, in "good order and repair," the condition of the property at the time of the lease is immaterial in determining the liability of the lessee for breach of such covenant.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

**4. STREET RAILROADS (§ 49*)—LEASE—LIABILITY OF LESSEE.**

In a lease of a street railroad system, which operated as an assignment of prior leases, under which the lessor held certain of the lines in the system, the lessee covenanted in effect to perform the conditions of the prior leases so long as its own lease continued in force. On the termination of the lease by the insolvency of the lessee and the appointment of receivers for both lessee and lessor, the receivers of the lessor surrendered such leased lines to the original lessors, who were subsequently awarded damages for breaches of their leases, which were made charges upon the estates of both their lessee and its assignee. *Held* that, as to such damages, the assignee was the principal debtor, and its lessor the surety, and that, on an accounting between them, the lessor was entitled to recover only so much as it should be required to pay to its own lessors.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

**5. STREET RAILROADS (§ 49*)—LEASE—ACCOUNTING BETWEEN RECEIVERS OF LESSOR AND LESSEE.**

Various items of claim and counterclaim considered and disposed of on the evidence on an accounting between the receivers of the lessor and the lessee of a street railroad company after the termination of the lease.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

In Equity. Suit by the Pennsylvania Steel Company and another against the New York City Railway Company and others, with three other cases. In the matter of the claim of the Metropolitan Street Railway Company against the New York City Railway Company for breach of lease, and petition of the receiver of the New York City Railway Company against the receiver of the Metropolitan Street Railway Company for an accounting. On exceptions to reports of special master. Exceptions sustained in part.

The following is the opinion of the special master:

The items of damage for breaches of covenants in the Metropolitan-City lease are herein disposed of substantially in the order in which they have been presented in the briefs of counsel; the amount claimed in claimant's briefs being stated in parentheses.

(1) For failure to keep in the stipulated condition the track and roadway of the underground electric lines ($1,683,375.66); the special work in connec-

tion with such lines ($316,956.06) and the track and roadway of the horse car lines ($165,376) in the Metropolitan System on September 24, 1907.

Counsel for the respondent City receiver insists that these items must be dismissed, because there is no proof of the condition of the rails and special work connected therewith on February 14, 1902, when the covenants went into effect. The City Company, it is said, is liable only for the expense of putting the road in the shape it was in when it took the property over, as otherwise it might be compelled to turn over in 1907 a much better road than it received in 1902. There is no such proof, but the answer to this contention is to be found in the promise of the City Company, contained in the fifth paragraph of the lease, "upon the expiration or earlier termination of this lease (to) deliver up said demised railroads and other property and all additions thereto in good order and repair." Whatever the meaning may be of the ordinary covenant contained in the first paragraph that "the lessee shall at all times * * * keep in good working order, condition and repair at its own expense all of said demised lines of railroad," it is clear that, when the lease ended, it was intended by the parties that the properties, when turned back, should be in good order and repair. The condition when the lease was made is therefore immaterial. For the same reason I do not agree with the contention that the claimant can recover only the cost of putting in rails of the same character as were there at the time the lease was made and not rails of a heavier or more expensive type. One of the purposes of the lease was the betterment of properties demised, and it contains elaborate provisions for the raising and expenditure of large sums to that end, and, where that had been done, the obligation to turn bettered properties back in good order and condition accrued. Where it had not been done at the termination of the lease, however, I think that no such obligation did accrue, and that the installation of heavier and more expensive rails during the receivership than were there when it began, necessitated by the introduction of steel wheels, or of pay-as-you-enter cars, and like causes, is a betterment, and that the respondent is not chargeable with the excess cost, as the claimant is here seeking to charge him. Such actual expenditures as are hereinafter considered in these connections as suggesting proper allowances should be diminished by such excess, if any, in determining the damages.

I think it must be concluded from the testimony of the claimant's engineer of way that most, if not all, of the lines, owned or leased, in the Metropolitan System, on September 24 or October 1, 1907, were not in what could be described as good order and repair. If by no other fact, this inference would be suggested by the length of time the tracks had been down and in use on those dates. This does not mean, however, that the claimant, as of those dates, is entitled to brand new lines of tracks throughout the system, and that the respondent estate is to be assessed at the cost of installing such. If from the evidence a sum can be arrived at sufficient to put the road in a condition for safe operation for a reasonable time after surrender, that, it seems to me, is the full measure of respondent's liability for the breach on these dates and must be accepted rather than the cost of building new lines which in some instances at least is what the claimant's figures suggest. In connection with the electric lines, the sums claimed above mentioned represent the entire amounts expended by the Metropolitan receivers for track renewal, which includes repaving in the railroad area and for special work not only in the year following the receivership but in the years 1909 and 1910, and even in the year 1911, at the end of which they ceased to operate, as well. Claims respecting certain of the lines may be summarized for the purpose of illustrating the extremity of the contention. Thus of the above amounts claimed there were expended on the Eighth Avenue line $518,050 for track renewal and $15,103.23 for special work, but none of its rails was renewed until 1910, when $283,000 were spent; the balance of $234,000 odd being expended in 1911. When the work was completed, a new track, heavier and more expensive than was there in 1907, with a repavement of the railway area throughout the route from Canal street to the Harlem, had been laid good for from 10 to 12 years, and its cost, it is insisted, measures the liability of the City Company for the breach of its covenant, although the respondent receivers had operated the lines for two years and a half before renewing any of the rails. The claims made respecting the Madison Avenue and Broadway lines present

similar facts not less extreme when all the circumstances are considered. Thus in the Madison Avenue line $322,730 is claimed for track renewal and $64,061 for special work. Of this amount, track renewal, for which $168,016 were expended, was not begun until March 21, 1910, the balance being expended in 1908 between 42d and 72d streets on Madison avenue, and of this balance $94,961 was for the installation of track in November of 1908, necessitated by the introduction of the very heavy pay-as-you-enter cars not in use prior to the receivership, which track, as a letter of the receivers to the Public Service Commission shows, had not been marked for renewal earlier than the spring of 1909. When the whole work was completed, a new and heavier track had been installed and the street repaved substantially from the city hall to the Harlem. On the Broadway line for track renewal, the sum of $369,513 is claimed, and it represents the cost of renewing practically the whole line from Bowling Green to 50th street with new and heavier track. Of this work $35,440 was begun July 17, 1909, $240,609 on August 26, 1908, 11 months after the receivership began, and the balance in 1909 and 1910. Of lines leased and owned there were some 19 in the Metropolitan System, exclusive of the Second and Third Avenue and Central Park lines, which subsequently went out of it and are not in this connection considered, and on 16 of the 19, including the 3 described, track renewal or special work or both were done during the 4 years and odd of receiver's operation, no claim being made on the remaining 3, which were crosstown lines and are evidently regarded by claimant as in a condition which complied with the covenant. Respecting many of the 13 lines on which work was done, questions not unlike those summarized in connection with the 3 lines referred to are suggested by the facts, and it may be said of all of them that they present generally the question as to whether the cost of new and better track and special work distributed over 4½ years after the beginning of the receivership, when none of the work renewed had been marked for renewal when the receivership began, and where the lines had been operated during the whole period, suggests a just measure of the damages caused by any breach of the City Company's covenants that may have existed at the beginning of the receivership. I am of the opinion, based on the results of the cross and redirect examination of Mr. Dougan, that it does not, for reasons which I shall attempt to indicate briefly.

Both parties refer to the Second Avenue breach of lease proceeding against the Metropolitan, the claimant to the figure there adopted, based on the testimony of the same witness as to the estimated but not actual cost of putting the lines of that company in repair, and the respondent to the testimony itself. In considering that conclusion and testimony, the circumstances under which the testimony was given must be recalled. There this claimant's ox was in process of being gored, and Mr. Dougan's testimony was proffered in support of a figure very much less than the damage urged by claimant there, though more than a lesser figure urged by the Metropolitan receivers, based on emergency repairs made by the there claimant receiver, and it was adopted, as the memorandum shows, because the offer of the higher figure foreclosed them from insisting on the lower. The respondent here is not bound by that conclusion, and has every right to have the witness' testimony there considered in connection with the testimony here. Doing that, I am convinced from the cross and redirect examination of the witness that he has not intended to apply nor applied any different standard to the lines testified to in this proceeding from that applied by him to the Second Avenue line. Here, as there, he testified that the Second Avenue line was the worst in the system; that the special work on that line was good for a year anyhow, and that the worst part of the track (41st street to 65th street) on that line should be rerailed in 1910; that in 1907 the "joints were not pounded to such an extent that we would have thought of rerailing it, and that it was in fairly good operating condition" in September, 1907. This testimony respecting the worst line in the system suggests the viewpoint from which testimony respecting the other and better lines should be looked at, and it is not inconsistent with it. Thus Mr. Dougan in 1907 would not have thought of rerailing the Eighth Avenue line for two or three years; special causes and not the condition of the rails themselves on 6th and Madison avenues necessitated relaying important parts of these lines at the time the work was done; rails on the Broad-

way line, next to the Second Avenue, the worst in the system, had been down but seven years when renewed in 1909; those on Ninth and Lexington Avenue lines, while not in bad condition, were renewed because they were putting steel wheels with larger flanges on the cars; and so on.  With reference to special work, he testifies that its life was about five years, and that such work, renewed in the second or third year of the receivership, did not indicate that it needed renewal in 1907; that special work renewed in October, 1908, had in 1907 at least a year of life in it; and that in the fall of 1907 he had looked over the special work marking for renewal all that had not a year's life in it.

Taking all the testimony into consideration, I think that the amount expended on work actually begun during the first year of the receivership (i. e., by October 1, 1908) in renewing electric track and special work diminished by the excess, if any, above noted may fairly be regarded as a full measure of such damage as had accrued on October 1, 1907, from failure to fully comply with these covenants.  I am aware that claimant argues that as receivers' certificates were not issued until June of 1908, the proceeds of which furnished funds for renewals, and that as the engineering force at the command of the receivers necessitated a renewal section by section, thus spreading the work over two summers, such work not being done in winter, no inference can be drawn that work done later was not needed then.  The difficulty is that his own witness on his redirect distinctly testified that he did not think that the renewal work done in 1909 and 1910 would have been done earlier if he had not had other work on hand, and that he would not have done it in 1908 if he had not been engaged in other rail renewal at that time.

I shall leave the figures representing the cost of work done for the report, as they can be checked up by the respective auditors in accordance with the principle indicated, but the amount of damage for failure to keep in good operation and repair the electric track construction and special work connected therewith should not exceed that figure, which, when ascertained, I shall adopt as fully measuring any damage that the Metropolitan Company had sustained on the date when the lease terminated by failure to observe these covenants.

The evidence contained in the record respecting the renewal of horse car tracks presents similar questions.  The claimants figure of $165,376 is based on the testimony of the assistant engineer of way, but the later summary furnished by him amounts only to $148,302.77, and is intended to include all the amounts actually expended by the receivers during their four years and a half of operation.  Of this amount some twenty thousand dollars were expended in the year 1908, and fifteen thousand odd in 1909, the balance approximating one hundred thirteen thousand, being much the greater part of the amount claimed, having been expended in 1910, 1911, and even in 1912. The expenditures represent, in part, the cost of substituting for "strap" rails very much heavier girder rails; but, as these were installed on ties instead of on stringers and ties, the cost was about the same, and the difference may be disregarded.  Here, again, I think the amount expended on work begun during the first year of operation will fairly measure the liability of the City estate.  It is a matter of common knowledge that the rehabilitation carried out by the receivers during their long period of operation was extensive and thorough, and that it resulted in putting the property, not only in good condition, but in a condition better than when the City lease was made and than it had been in before.  The damages, as in the case of the electric track repairs, can be checked by the auditors for insertion in the report, and in the case of each overhead charges, based on the percentages accepted by the parties, as set forth in the exhibits, should be added.

(2) For failure to keep in the stipulated condition the rolling stock on hand on September 24, 1907 ($686,420.91).

Of this amount the respondent receiver concedes $93,372, being the amount actually expended in the rehabilitation of cars in the Stephenson shops, exclusive of those there rehabilitated which were delivered to the Second Avenue receiver.  It is also conceded that the receivers actually rehabilitated 1,679 cars in addition in their own shops.  The difference between the amount claimed and the conceded amount represents an estimated cost of this rehabilitation in receiver shops, and it is precisely because it is estimated and not capable of verification by his auditor from the book entries that the re-

spondent objects to it. It is, however, supported by the testimony of expert witnesses, having knowledge of the condition of the cars, that it represents, in their opinion, the reasonable cost of restoring the cars in good operating condition and is the same evidence given by the same witnesses on which a similar finding was reported to and adopted by the court in the Second Avenue breach of lease proceeding. It is also to be noted that it apparently suggests a figure not as large as that for the rehabilitation in the Stephenson shops, which respondent concedes. The apparent discrepancy in the figures given respecting rehabilitation of electrical equipments, which counsel notes, results, I think, from a mere transposition of items, and does not affect, the total.

Subject to verification, I think the figures claimed should be reported under this head.

(3) For failure to replace electric cars and motors destroyed by fire ($1,199,495.39).

The covenant in the lease is that the lessee "will replace any part of the demised property, or of any additions thereto which may be destroyed by fire or other causes, and upon the expiration or earlier termination of the lease will deliver up said demised railroad and other property and all additions thereto in good order and repair."

There is no question as to the number of cars and motors destroyed, nor is there any as to the cost of replacing those burned by new ones; the figure claimed being such cost. The respondent contends, however, that under the language quoted the lessee is bound merely to make good the Metropolitan's loss, and that the value of the cars should be taken as of their dates of loss, or at the most as of the date the lease went into effect. I do not agree. The record contains no evidence, which it was respondent's duty to furnish, that cars and motors in good condition could have been obtained for any less figure than that demanded for new cars and motors, and the undertaking to replace is absolute. I think the figure suggested must be reported.

(4) Failure to keep the electric power plants, substations, and transmission lines (feeder ducts, cables, and channel rails) in good condition ($683,217.29).

The inquiry as to these items suggests a situation not unlike that presented by the claims for track renewal. The total amount is subdivided into (a) claim of $258,769.65 for damage to the 96th street power station on the East River; (b) substation renewal, $208,991.40; (c) $117,603.02 for channel rail renewal; and (d) renewal of feeder system, $30,508.98, to which items are added overhead charges.

The claimant's contentions here are somewhat more extreme than in the case of track renewal, for of work claimed for and included in the total nearly $160,000 in value has not been done at all. If the receivers, with the resources at their command, did not in their long period of operation find it necessary to do this work, it fairly suggests a doubt as to whether it was necessary to put this property in "good operating condition and repair" when the receivership began. Of the actual work done, that asked for under (a) includes only $84,629 done on work begun during the first year of the receivership; other items amounting to $138,062 having been begun in 1909, some of which were not finished until 1911, the remaining items not having been begun until 1910. Of the work claimed for under (b), $144,636 has not been done at all, and of that done and paid for only a small portion was begun in 1908. Of that done under (c), being the channel rail renewal, but $35,000 was done on work begun during the first year; $66,000 of the balance having been begun in 1910. As it resulted in installing rail, the life of which was eight or ten years, the injustice of charging it all to the City estate seems to me to be obvious. Similar facts are presented under (d) for the renewal of the feeders, the total amount claimed for which is $30,508.98, of which but $12,000 was spent in 1908.

Of the amount allowable under these four heads, I think that the portion expended for work begun during the first year should be the limit of liability, and such amount, increased by the overhead charges, will be reported.

(5) Renewal of lighting and telephone plants ($32,594.67).

Of this amount some $16,844.15 was expended for work begun during the first year of the receivership. There is some doubt as to whether this includes all the work begun during that time, but the correct amount can be

ascertained for insertion in the report, and will be taken as the measure of the liability in this connection.

Where any item has been considered and disposed of under one or another of the foregoing heads, it should be excluded from consideration in connection with repairs to buildings.

(6) Claim for failure to keep the tracks in buildings in the Metropolitan System in good condition ($301,651.54).

In the reply brief the claimant concedes that this amount should be reduced to $281,338.51. This amount, as reduced, is for damages for failure to repair "wooden" tracks in 13 buildings; the term "wooden" referring to pit and slotted electric tracks and horse car tracks laid on wooden ties and stringers, as distinguished from concrete construction. None of these "wooden" tracks, which was the construction in all of the buildings at its beginning and during all or the greater part of the existence of the lease, has ever been replaced by new wooden construction, the estimated cost of which, in all of them, suggest the figure demanded, although in 7 of the 13 buildings, some of which had been destroyed by fire, the receivers, during the period of operation, replaced the wooden with concrete construction in whole or in part. This wooden construction had been in each of the buildings at and prior to the making of the lease in some instances for many years. While the claimant is not under the lease limited to the cost of restoration to the condition in which these tracks were at the commencement of the lease which has been held to be immaterial, it is nevertheless true that the age of these tracks at the termination of the lease on October 1, 1907, is very material, for the tenant is bound to nothing more than to return them in good repair as old premises, where they were leased as such, which is a very different matter from being bound to return brand new tracks on new wooden substructure, which is what the claimant is demanding in each building. There is before me, however, no evidence of the cost of returning them in repair as old premises. Doubtless if, at the termination of the lease, the wooden structure and tracks were in such condition that they could not be repaired, the cost of replacing them would suggest the maximum damage, and might be recovered, but the evidence shows no such condition in any of the buildings. In six of them no repairs have been made at all, which is proof that on October 7, 1907, the tracks were not in a condition that could be described as nonusable, and, if they were in a condition requiring repairs, that condition and the cost of bettering it are not shown. In some of the seven buildings in which concrete construction has replaced wooden construction in whole or in part, as in the building at 32d street and 4th avenue, 54th street and 9th avenue, and at Lenox avenue and 146th street, the concrete construction was installed by the receivers as part of a general plan of reconstruction of the whole building; the record not suggesting the condition of the wooden tracks replaced. Indeed, the testimony of the claimants' expert is to my mind based on the fact that he regarded these wooden tracks as a "fire menace," and his estimate is largely, if not wholly, based on that theory, and not on the actual condition of the wooden construction, of which, in some instances at least, it seems clear that he had not personal knowledge. As matter of law, a covenant to repair or to return in good repair does not require the removal of a lawful wooden construction in otherwise good repair because it is a fire menace. The witness' testimony respecting the car house at Madison avenue and 86th street illustrates the difficulty of recommending findings which might support even a rude approximation to the damage actually suffered, if any. That building was burned down in the summer of 1907, yet the witness testifies, not only that the wooden tracks survived, but that those same wooden tracks, with some little patching up by the receivers, the extent and cost of which are not shown, are in use to-day. He nevertheless testifies to $10,463.27, the cost of replacing the structure and tracks, and not the cost of repairing them at all, and the claimant is asking that that figure be adopted in face of the facts that the tracks survived the termination of the lease and have been in constant use since—a period of many years. With reference to the tracks in all of the buildings, except those that had burned down, the only inference from the record is that they were usable, and while it may be true that, even as old premises, the evidence suggests that they may not have been in such

condition as the covenants required, it is yet true that it does not show what that condition was, and what the cost of repairing, as distinguished from replacing, would be likely to be. It seems to me to be quite impossible to suggest any figure as even a rude approach to such damage as may have been incurred respecting this item, although, under the rules of law applicable and on the record as made, it is clear that it could not have been very large. I think, in view of the nature and extent of the subject-matter, the difficulty of proof under the rule controlling, and the inferences to be drawn from undisputed facts, that such damage as there may have been, constituting, as it does, a minor item of a large unliquidated claim against an insolvent estate, must, on the evidence disclosed, be regarded as negligible.

(7) Claim for failure to keep buildings in the Metropolitan System in good condition ($1,375,931.43).

The buildings referred to are 20 in number. Of these 3 were burned just prior to the receivership, being the 86th street barn on the Madison Avenue line, for which $153,527 are claimed, the 146th street and Lenox avenue car house, for which $510,198 are claimed, and the office building on 49th street and 8th avenue, for which $132,113 are claimed; the total for the three being $845,832, or nearly 62 per cent. of the whole amount. As the City Company was bound to replace these, a reasonable approach to accuracy may be made in estimating loss, although the claims are, I think, in excess of the value of the buildings when destroyed. Of the 17 remaining buildings, 3 were rebuilt during the receivership, that at 32d street and Madison avenue, for which $282,421 are claimed, that at 54th street and 9th avenue, for which $79,382 are claimed, and that at 23d street and 11th avenue, for which $16,612 are claimed, a total of $378,415. These figures do not represent the cost of the new buildings, but are intended to be estimates of the cost of repairing the buildings replaced when the lease terminated on October 1, 1907, but on the evidence, so far as the 32d street and 54th street buildings are concerned, they are altogether excessive. The balance of the amount claimed for the remaining 14 buildings is only $151,674, and it is intended to represent the cost of repairing them in compliance with the covenants. It will not be profitable to attempt to summarize evidence respecting each of these buildings, and I shall simply indicate the amounts representing costs to repair as of October 1, 1907, which I shall report to the court.

Substations.

| | | |
|---|---|---:|
| Street—Front Nos. 13 and 17 | | $ 1,800 |
| 25th near Lexington Avenue | | 5,000 |
| 50th and Sixth Avenue | | 3,400 |

Power House.

| | | |
|---|---|---:|
| 96th and 1st Avenue | | 5,300 |

Stables.

| | | |
|---|---|---:|
| 10th and 11th, Avenue C | | 11,000 |
| 11th, Nos. 711–717 | | 2,000 |

Offices.

| | | |
|---|---|---:|
| 49th and 8th Avenue (west side) | | 115,000 |
| 49th and 8th Avenue (east side) | | 1,700 |

Storage House.

| | | |
|---|---|---:|
| 152d and 8th Avenue | | 3,800 |

Car Houses.

| Street | Avenue | |
|---|---|---:|
| 24th | 11th | 7,500 |
| 86th | Madison | 140,000 |
| 32d | 4th | 115,000 |
| 99th | Lexington | 10,500 |
| 100th | Lexington | |
| 54th | 9th | 40,000 |
| 50th | 6th | 28,000 |
| 50th | 7th | 15,000 |
| 50th | 8th | 10,000 |
| 146th | Lenox | 450,000 |
| 23d | 11th to 13th | 10,000 |

Total ........................................................ $975,000

(8) Claim for failure to pay taxes upon the property in the Metropolitan System, including lines owned and leased, but excluding leased lines, the leases of which were not adopted by the receivers ($3,009,588.82).

As a result of an interchange of briefs, counsel for claimant concedes the inclusion of an item of $154,622.09 for interest on special franchise taxes accrued prior to the making of the Metropolitan-City lease, for which the City Company is not liable, so that the amount claimed is reduced to $2,853,-966.73. Of this amount the counsel for the City receiver concedes only $1,729,-420.76. The claimant, relying on the Central Crosstown Case, 198 Fed. 756, 117 C. C. A. 503, and the Metropolitan Stockholders' Appeal, 198 Fed. 761, 117 C. C. A. 503, includes taxes accruing in the year 1907 after September 24th, with interest on all taxes down to December 10, 1907, being the date fixed by the court for the filing of claims. At the time the cases cited were decided by the Circuit Court of Appeals, the date of the termination of the lease had not been judicially determined, although that court did hold that operation by the City receivers had ceased on September 24, 1907. Since that time in the Second Avenue and Central Park breach of lease cases, the District Court has held that the lease terminated on October 1, 1907, and it did it on a record which suggested the question which the records before the higher court, as its opinion stated, in the cases cited, did not do. No claims accruing subsequent to that date under these later decisions of the District Court which have just been affirmed in this respect by the Circuit Court of Appeal are provable, so that the taxes for 1907, which did not accrue until October 7, 1907, are therefore disallowed, as is all interest on unpaid taxes after October 1, 1907. The interest accrued on taxes to October 1, 1907, which the respondent does not concede beyond September 24, 1907, should be calculated to the later date, October 1, 1907.

Of the other kinds of taxes disputed by the respondent, only those actually due and payable on October 1, 1907, are allowed, with the accrued interest to that date. Such of them as are conceded are, of course, allowed.

(9) Claim for failure to pay rentals and charges in the nature of rentals due to lines leased to the Metropolitan Company, exclusive of those lines, the leases of which were not adopted by the Metropolitan receivers ($1,787,492.34).

Of the above amount, only $660,229 was due on October 1, 1907; the balance becoming due at a later date. Under the rule applied under the preceding head respecting the taxes, the claim for this balance is disallowed. The $660,-229 was paid by the receivers on September 30, 1907, and, as it became payable on the day the lease has been held to have terminated, it is allowed, as the law does not take account of fractions of a day.

Of the balance of the total amount claimed, $96,693.55 is for payments made under operating agreements for interest, but of this amount only $60,416.67 was due on October 1, 1907; the remainder maturing at a later date. Only this $60,416.67, therefore, is allowed.

The remainder of the amount claimed ($787.68) is for expenses in connection with the operation of leased lines. The Exhibit 75 refers to these items as not due on September 24, 1907, and as due prior to December 10, 1907. The accountant's testimony suggests the inference that they were not due on October 1, 1907, and they are therefore disallowed.

(10) Claim for the failure of the City Company to pay certain miscellaneous items ($90,617.07).

(a) Of this amount $55,497.78 is claimed for expenses incurred in connection with special franchise tax litigation. With the possible exception of an item of $5,250 for referees' fees incurred prior to October 1, 1907, which has been allowed in the inter-receivership accounting, and which the Metropolitan estate will receive in full, the charge is for services requested by, rendered to, and paid for by the receivers after October 1, 1907, the date when it has been held that the lease terminated. Counsel for claimant, in their brief, apparently think that the stipulation in the record, providing that, in the event that it is held that the City Company is chargeable with the expenses of settling any special franchise taxes, such expenses shall be apportioned to the taxes of each year, entitles them to this allowance. That stipulation, however, becomes effective only in the event that the City Company is held to be legally chargeable with such expenses, which I do not hold it to be. The whole amount is disallowed.

(b) The claim of $11,540 for clearing away the ruins of the fire of April 8, 1907. This claim the respondent concedes.

(c) The claim of $23,579 based upon the apparent overpayment to the City Company by the Degnon Contracting Company.

In the face of the objection of counsel, it is clear that this claim must be disallowed. It rests on nothing more than the inference drawn by the accountant from the fact that the City books show an excess payment from the Degnon Contracting Company in settlement of claims against it of $23,579.29, and that on the Metropolitan books appear entries showing an unliquidated charge against the same company of $28,404.69. The accountant frankly testifies that there is nothing to show what the payment was for, as to whether it was an overpayment to the City Company or was intended to cover the Metropolitan account, except an inference which might be drawn from the general condition of the account and the manner in which the correspondence (which is not in evidence) was carried, on which would indicate that the accounts were handled as one account by the City Company. He also says that there was no consistency in the billing, and that it was not the custom to bill all charges in favor of either company against the Degnon Company in the name of the City Company. In other words, that the Metropolitan Company is entitled to the excess is admittedly a guess.

(11) Claims for failure to comply with covenants of the City lease respecting property of Metropolitan lessor lines, which went out of the system during the receivership not heretofore considered as follows: That of the Second Avenue Company ($847,628.28), of the Central Park, North & East River Company ($670,730.36), and of the Fulton Street Company ($7,511.81).

These three items can be disposed of together, as one or the other of the two objections of the respondent receiver to the claim respecting the Second Avenue Company applies to the two other claims.

As to Second Avenue and Central Park properties, the parties have made a stipulation which may be summarized as follows: That with reference to the expenditures necessary to put them in good and working order, condition, and repair as of September 24, 1907, the testimony taken before me in the breach of lease proceedings by these original lessors against the Metropolitan and City estates, based on the covenants in the original leases from those companies to the Metropolitan as to the condition of the property of the Central Park on August 5, 1908, and of the Second Avenue on November 12, 1908, and of putting them in good repair as of those dates, shall be taken as describing such condition and cost as of September 24, 1907.

The Circuit Court of Appeals has just decided that the Metropolitan and City lease terminated as between the parties on October 1, 1907, and that the Central Park and Second Avenue leases to the Metropolitan terminated as between the parties at the end of the periods of their occupation by the Metropolitan receivers, to wit, on August 6, 1908, and November 12, 1908, respectively. The court has also decided that, by virtue of the Metropolitan-City lease, the City Company was the assignee of the Central Park and Second Avenue leases to the Metropolitan Company and liable as such to those lessors by privity of estate (it does not say by contract) for breaches of covenants running with the land.

The findings against the Metropolitan Company's estate in the Second Avenue proceeding referred to in the stipulation were as follows:

| | |
|---|---|
| Track, roadway and electric equipment | $475,375 02 |
| Rolling stock exclusive of motors | 81,647 94 |
| Special franchise taxes | 290,603 32 |
| | $847,626 28 |

The respondent's counsel objects to the allowance of the first two items, because the stipulated evidence does not show the damage to the property described at the date of the Metropolitan-City lease April 1, 1902, and because it does not apportion between the Metropolitan and City Companies such damage for their respective periods of operation under the Second Avenue lease. In spite of the earnestness with which the contention has been urged, I am not convinced that the City Company is not liable to the Metropolitan.

for the full stipulated amount. It clearly covenants on the expiration or earlier termination of the lease that it will surrender the properties demised in good order and repair. The court has said that the lease terminated on October 1, 1907, and the parties have stipulated in effect that on that date these items were not in that condition, and that the figures named were needed to restore them to it. Nothing is said about restoring them to the condition they were in on April 1, 1902, nor as to apportioning damage. As the court, reversing what has been heretofore held below, has decided that the City Company is liable to the Second Avenue Company by reason of privity for breaches of covenants in the Second Avenue lease, it may or may not be that damages for such breaches are apportionable, and that the condition on April 1, 1902, is material in a proceeding by that company against the City Company for those damages, but the claim here is not for a breach of those covenants. These disputed items must, I think, be allowed. The franchise taxes should be allowed, with interest to October 1, 1907, and in the sum of $275,391.64.

I think the same answer must be made respecting, not only the track and roadway of the Central Park Company, but the horses, cars, and harness as well. The stipulation was, I suppose, intended to cover all items, not only the former, which is clear, but the latter as well.

The Fulton Street special franchise taxes are allowed as claimed; the interest to be calculated to October 1, 1907.

What has been written disposes of all items claimed for breaches of covenants in the Metropolitan-City lease urged by Metropolitan receivers, except those for damages to Third Avenue properties which have not been submitted and which will be separately reported on.

The total, when ascertained, it is conceded, is to be diminished by $1,326,-887.45, being the amount of insurance collected for property destroyed by fire, for which damages have been allowed above.

It is contended by the replicant receiver, and was conceded by claimant, that the amount is to be reduced still further by some $2,000,000 (more or less) of the 5 per cent. improvement notes of the Metropolitan Company, duly issued and still unpaid, which were apportioned to the suit in equity as part of the proceeds of settlement divided between the two receiverships in accordance with the principles finally approved by the Circuit Court of Appeals in the so-called apportionment proceeding. 198 Fed. 725, 117 C. C. A. 503. Speaking for the court in that case, Judge Ward says of these notes so apportioned that they "may be proved by the receivers of the City Company against the estate of the Metropolitan Company." The replicant receiver here asserts the right to use them as a set-off in this proceeding, and in his reply brief the claimant receiver conceded that right. Counsel for the New York Railways Company, purchaser of the Metropolitan properties at the foreclosure sales, and a creditor by assignment and otherwise of the Metropolitan estates, subsequently filed a brief contesting this right of set-off, and the claimant receiver has withdrawn the concession. I think the Railways Company has a right to have this question passed upon, and shall dispose of it so that it may be before the court.

The contention of Railways Company is that, as these notes were received in 1910, long after the receivership of the Metropolitan began, as part of the settlement of claims due the City estate, the transaction must be regarded as a purchase by the debtor of an insolvent after the date of insolvency of a claim against the estate, which may not, as a matter of law, be used as an offset against the claim due the insolvent. This is unquestionably the law, but, if I understand the complicated facts aright, I think it may be said that the claim represented by these notes was outstanding in the City Company at the date of insolvency. Neither at that time nor subsequently had these notes had any inception. It must be remembered that under article 15 of the lease the City Company had, at the date of insolvency, a claim for capital expenditures against the Metropolitan Company about equal to the amount of these notes so apportioned, in excess of any payments it had received up to that time for such purposes under the agreements of May 22, 1907. The four notes of which those apportioned were a part had not passed under the

agreements of May 22, 1907, from the Interborough-Metropolitan to the Mercantile Trust Company, nor to innocent holders. If they had been where article 15 of the lease provided that they should be, they would have been with the City Company on the date of its insolvency, in which case, under the authorities cited by counsel, they would clearly have been available to defeat or reduce any claim then outstanding against the City estate in favor of the Metropolitan Company. I think, on the facts here suggested, that on the date of insolvency the City Company was the equitable owner of the notes, wherever the legal title may have been, and that the City Company is not limited to proving an independent claim against the Metropolitan estate and to an offset of distributive shares in the estates of the two insolvents, which, as the distributive share of Metropolitan creditors is likely to be much smaller than the distributive share of City Company creditors, would result in inequality.

The respondent is entitled to an additional credit for $638,821.78, being sums expended between May 27, 1907, and September 24, 1907, on buildings destroyed by fire.

As the item of $15,545.56 is to be allowed in the inter-receivership accounting, it is not allowed here.

After this case was submitted by the receivers, the Farmers' Loan & Trust Company, as substituted trustee under the Metropolitan refunding mortgage, which was made subsequent to the Metropolitan-City lease and subject to that lease, filed a brief with a twofold purpose; one being to obtain a ruling that it alone is entitled to all items of recovery herein against the City estate in favor of the Metropolitan estate, based on covenants running with the land, the other being to re-enforce the demands of the claimant receiver and to answer contentions of the replicant. In this latter aspect the brief has been carefully considered in connection with the items of damage heretofore passed on, but I think, as to the other question, that it should not be passed on here and now. Counsel for claimant and for the Guaranty Trust Company, trustee under the prior General and Collateral Trust Mortgage which covers much of the property mortgaged to Farmers' Loan, urge that parties interested in the final disposition of items are not before the court in this proceeding. In any event, I doubt, after examining the orders of reference, whether an opinion on this matter has been asked. I therefore decline to pass on it.

A proposed report in accordance with the foregoing to be submitted and a copy served on respondent on June 10th. Exceptions and amendments thereto to be served on or before June 15th. Hearing thereon on June 15th, at 2 p. m.

## Claim of Metropolitan Street Railway Against New York City Railway Company.

LACOMBE, Circuit Judge. This is a claim for damages resulting from breaches of covenants in the Metropolitan-City lease of February 14, 1902. The items of claim will be considered in the order in which they were taken up by the special master, and this opinion will avoid, as far as possible, any restatement of the relations of the parties as set forth in the special master's opinion; both opinions must be read together for a full understanding of the controversy.

[1] 1. The first item of damage arises from the failure of the City Company, lessee, to keep the track and roadway of the underground electric lines, still in the Metropolitan System, and special work in connection with said lines in a proper condition of repair. The controlling clause of the lease is contained in the fifth paragraph. It reads:

"Upon the expiration or earlier termination of this lease (to) deliver up the said demised railroads and other property and all additions thereto in good order and repair."

The special master held that this meant what it said, viz., that, when the properties were turned back by coming into the hands of the receivers, they should be in good order and repair; also that, in cases where heavier or more expensive rails had been substituted for rails in use when the lease was executed, it was the structure thus improved which was to be delivered up in good order and repair; also that, where such a betterment had not taken place before the termination of the lease, the obligation was merely to keep the existing type of structure in such condition. This construction of the lease is fully concurred in.

[2] The sum claimed is $2,000,531.72, being the total amount expended by the receivers in putting these several tracks and roadways in the condition of good order and repair which the lease provided for by renewing the same. Counsel for claimant states that, out of a total of over 119 miles, the amount claimed relates to 51.43 miles only; as to the remaining miles of track and roadway no contention is made that renewal was required. The special master held that upon 16.25 miles only should there be any allowance for money actually spent to put the same in good order and repair. These figures are given in claimant's brief, and, as their accuracy is not challenged in respondent's brief, they are accepted. The money actually expended by receivers for this purpose may be thus distributed:

| | |
|---|---:|
| September 24, 1907, to October 1, 1908 | $ 684,351 90 |
| October 1, 1908, to September 30, 1909 | 288,924 40 |
| October 1, 1909, to September 30, 1910 | 609,877 61 |
| October 1, 1910, to December 31, 1911 | 241,935 63 |
| | $2,000,531 72 |

The total amount allowed by the special master is $684,351.90.

When receivers took over the road on September 24, 1907, it was generally understood that the tracks and roadway of very many of the lines which made up the system were in a most deplorable condition; financial exigencies had handicapped the lessee for a long time; everything in the way of expenditure that could be staved off had been passed by, and in consequence there had been great deterioration. Whether reports as to existing conditions came from within or without, from old employés, or special technical men retained to investigate, or from inspectors of the Public Service Commission, or from reporters and correspondents vociferous in the newspapers, they were at least unanimous, to the effect that very much was required to put the system as a whole in a decent condition to render proper service to the public. The receivers were grievously harassed with the appreciation that they were confronted with a situation which called for the immediate expenditure of millions and had but a few thousands available. To one, whose recollection of the experiences of that time is still vivid, the proposition that on September 24, 1907, the track and roadway of the underground electric lines embraced in this claim could, by the expenditure of only $684,351.90, be put in "good order and repair" comes as quite a severe shock.

The conclusion of the special master is, of course, predicated on the actual record before him, and that record must be turned to in order to test the accuracy of his conclusion. Substantially the entire record

is comprised in the testimony of a single witness, Mr. William T. Dougan, now engineer of maintenance of way of the New York Railways Company, who for 11 years was either in charge of electric underground construction for the Metropolitan and City Companies or was their engineer of maintenance of way. This witness testified in the Second Avenue breach of lease proceeding, and there impressed both the special master and this court with the fullness of his knowledge and the fairness of his statements. Countless references to the testimony of this witness are found in the briefs of both sides, but these references have been disregarded, and the court has made a careful and exhaustive study of his whole testimony. The result has been to confirm the court's original impression and to convince it that on September 24, 1907, very little of these 51.43 miles of track was in good order and repair; portions of it had outlived the normal expectancy of its life, about 10 years, except where wear and tear is exceptionally heavy; the rest was practically on the last lap, presenting a condition over which cars might be run, but uneconomically for the company and to the discomfort of the passenger, very much below the first-class condition in which a road properly cared for should be maintained.

That the special master reached the conclusion that all that was needed to put the tracks and roadway of these lines in good condition was the money expended during the first year of receivership, a sum looked upon at the time as "first aid to the injured," or, as the special master aptly expressed it in the Second Avenue case, "emergency repairs," seems to have resulted from giving undue weight to certain considerations which were advanced in opposition to the claim. As to all, or nearly all, of these lines, the witness at one place or another in his testimony said that in September, 1907, the line had not been "marked for renewal," or that at that time he would not have "thought of rerailing it for two or three years yet," or something to the same effect. It may be noted, however, that of these very same lines the same witness said that they were not in good order and repair; that there were a "great many low joints," "number of broken rails," "quite corrugated rails," the "tramrail needed renewing," the "pavement was in bad condition." There is no real discrepancy between these statements.

The witness was the engineer of maintenance of way of the lessee, who made inspections every fall and designated the portions of track and surface which should be renewed (in place of makeshift repairs) in the ensuing spring and summer. But naturally he knew perfectly well the policy of his employer, which was to get the very last day of life possible out of every rail and avoid the heavy expense of a renewal, where cars could still be run. Of course cars could be run when tramrails and pavement were in bad condition, so long as the slot rail remained in good shape. It is noticeable that, in nearly every line about which the witness testifies to bad condition of tram and pavement, he says, "The slot rail was all right; there is no claim for that." Quite possibly with a good slot rail cars could be run over the trams even until the latter were reduced to the traditional "two streaks of rust." They were not so bad as that, but the testimony seems, to me at least, conclusively to establish the proposition that in all these lines there was such an amount of low joints, etc., that the running of cars

over them resulted in constant breaking of trucks and other car damage, not to speak of the discomfort of the passengers who were jolted over a road not in first-class order and repair. The expense of repairing the cars, which were run under such conditions, would be much less than the heavy cost of renewal of tracks and pavement, and therefore, the company, financially embarrassed, would, as a matter of policy, discourage renewals—a policy which all its employés would thoroughly understand. I find no significance, therefore, in the statements of the witness that he would not have marked these portions of the road for renewal in September, 1907, nor in the further circumstance that cars were in fact run on them for two or three .years after September, 1907.

Nor is there any weight in the circumstance that some of them were not renewed by receivers until two or three or four years after they took possession. It must be remembered that it was not financially possible to do more than emergency work until they could issue and sell the $3,500,000 of receivers' certificates, more than eight months after their appointment. Claimant also argues that:

"With the engineering force at their command, the receivers could economically renew the rails only by taking up the lines section by section and spreading the renewal work over a period of two summers (it cannot be done in winter), which would bring it to 1910."

But there was another more important reason for doing the work in sections. The renewal of tracks and pavement in a street of this city is always the cause of much discomfort, not only to the passengers in the cars, but also to all traffic in the street and to the abutting owners as well. The usual cycle of events is: First, a host of complaints from all quarters as to the condition of the road, and then, as soon as work of renewal is begun, a similar host of complaints as to piling paving blocks, structural iron, etc., on the sidewalks, interference with access by vehicle to the houses on the line, interference with traffic, etc. Two or three lines in different parts of the city might be put under renewal at the same time, but if the receivers, with unlimited money at their command, had undertaken to renew these 51 miles all at the same time, the result would have been a vexatious and intolerable nuisance. No one with any decent regard for the convenience of the public would have undertaken to do the work in that way.

In this total claim there are items of expense resulting from an improvement in the renewal, beyond any improvement up to that time installed by the lessee; also in portions of the line there may have been a brief period of good life in parts of the old structure. These items may properly be eliminated from the claim. It would seem to be a great waste of time and money to dig these items out of the claim. It is time that the various questions involved in these receiverships were brought to a close, by compromise if not otherwise. From an examination of the records and the careful analysis of the figures given in the briefs, I am satisfied that 15 per cent. of the amount of the claim is a very liberal allowance for these items. The conclusion of the special master is therefore modified by awarding claimant for this part of the claim $1,700,451.97.

2. For reasons sufficiently set forth supra, the item claimed for failure to keep the track and roadway of the horse car lines still in the Metropolitan System in good order and repair, $165,376, is allowed to the extent of 85 per cent., viz., $139,569.60.

3. The next items claimed are for failure to keep the electric power plants, substations and transmission lines, lighting and telephone plants in good order and repair.

As to the channel rail, the witness (Armstrong) testifies very specifically as to its condition in September, 1907, worn down to great thinness with holes in places, liable to buckle and to catch the shoe of the car plow. As to the feeder system generally he states that what was done was necessary to be done at that time to put it in good working order, condition, and repair. As to the other items, he does not go into details as to their condition, but the fair interpretation of his testimony is that the various things that were done were done because existing conditions required the doing of them. The special master evidently so construed it, because he allowed claims under all of the five subheads, but reduced the totals by the application of the rule that only what was spent by receivers in their first year's operation should be allowed. There can be little doubt that the state of general dilapidation into which the whole outfit had been allowed to fall was to be found here, as elsewhere, when receivers took possession. Necessarily some parts had to be kept up, as the slot rails were, to allow the cars to be run at all.

I do not see why the City Company is not liable under its covenant for the $15,000 required to put the coal conveyor in proper condition, although, instead of thus treating the old conveyor, they built an entirely new and more efficient one at a cost of $60,000. The same rule should apply to the Front street substation, which was abandoned; the money which would otherwise have gone into its reconstruction being (with a very much larger sum in addition) expended in building a substation to take its place and do its work, in a different but equally convenient and efficient place. The claim is allowed, but in the hope that a compromise discount may save further controversy over these branches, which involve much testimony and the classification of an infinite amount of detail figures, 15 per cent. may be taken off, as in the case of items 1 and 2, supra. Counsel may figure out the totals and agree as to necessary amendments to the findings.

4. The special master's opinion, findings, and conclusions as to damages for failure to keep the rolling stock in repair are fully concurred in.

5. Failure to keep the tracks in buildings in good condition.

[3] Thirteen buildings are referred to in the testimony. Many of these buildings and the tracks in them were old and presumably already more or less patched up in 1902. But that circumstance is immaterial; the lessee took the premises in the condition in which it found them, but it covenanted that when the lease terminated, whether in 999 years or in 5, they should be in good order or repair. These tracks consisted of rails and appurtenances laid on timber structures— a method considered to be good engineering when they were built, perhaps so considered even so late as 1902. When the receivers rebuilt

them, however, that type was condemned by engineers and its building forbidden by the city of New York on account of risk of fire. Therefore a new type with concrete substructure was substituted. For the increased cost of such improved type, no claim is made. The witness (Potter) expressly states, several times, that his estimate is for rebuilding with timber, not with concrete, also that his estimate for replacing the wooden track provides for the same weight of rail and special work as was there when the track was put in, and does not call for heavier weight of rail. If the evidence establishes as to the tracks in any of these buildings that mere patching up would not put them in the covenanted condition, the witness' estimate, which is nowhere contradicted, should be allowed. There is no affirmative testimony that they could have been repaired without renewing, or what would be the cost of so doing; the contention is that rebuilding alone would put them in good order and repair. As to some of them, the testimony is not sufficiently specific to warrant this conclusion. I cannot concur, however, in the conclusion of the special master that the rebuilding was in all cases rendered necessary only in order to eliminate the fire risk resulting from timber construction. The testimony as to the building (a) at 4th avenue and 32d street shows that the track was in very poor operating condition. The timbers were old and worn, patched in many places. The slot was rough and out of line, endangering the plows. It was carried on what might be called a patchwork set of posts from the cellar floors, which were old and settled, throwing the car out of line and surface. Joints were spread and uneven and very rough, so that frequently the cars went off the track. To put it in original condition required all new timbers, as the wood was old and rotten, new rails, and new bolts. As to (b) the building at 11th avenue and 24th street, the condition was slightly different from the 4th avenue and 32d street car house, because the track was built on the ground floor. The land was originally the shore of the North river, low and damp. The timbers were old and rotted. The whole structure was in very poor condition. As to (c) the building at 8th avenue and 50th street, the tracks were in very poor operating condition, rough, out of line, and dangerous (besides being subject to fires). They had been patched up in numerous places and were pretty far gone, had outlived their usefulness. As to (d) building at Lexington avenue and 99th street, the track, all timber construction, was rotted at many places and unsafe for operating. As to (e) the building at 6th avenue and 50th street, all that is testified to as to existing conditions is that the tracks were in much poorer condition than the building itself. The timbers had become a little oil-soaked, and the greatest objection to them was the danger from fire. As the special master allowed only $28,000 for repairs to the building, which allowance is not excepted to, the testimony does not seem to warrant a conclusion that the tracks could not have been repaired without rebuilding. As to the building (f) at 100th street and Lexington avenue, the track was a very awkward and dangerous platform built on heavy posts, braced and cross-braced, and a network of timbers dangerous, dirty, and inflammable, half worn out five years before. Inasmuch as the witness says of the track on the second floor of the same building that he made no allowance for it in his estimate,

"for the reason that it was still in good operating condition, except for lack of power," it is a reasonable inference that the condition of the lower track was such as to require renewal, irrespective of any fire risk. As to the building (g) at 8th avenue and 152d street, which had lain idle and uncared for for years, the wooden ties and stringers rotted and the rails were therefore very much out of line and surface.

As to items (a), (b), (c), (d), (f), and (g) the estimate of Potter will be allowed; as to item (e) above and all the other tracks in buildings, the conclusions of the special master are affirmed.

6. Damages for failure to replace cars and motors destroyed by fire. The opinion of the special master is concurred in and his conclusions affirmed.

7. Damages for failure to keep buildings in good condition; the same disposition.

8. For rentals and charges in the nature of rentals, including taxes, the conclusions of the special master allowing only such as accrued on October 1, 1907, is affirmed. The later decisions of the Court of Appeals seem to require such a disposition of them.

9. Miscellaneous items (expenses in connection with franchise tax litigation, clearing away ruins of a fire, alleged overpayment to Degnon Company) are similarly disposed of by affirmance.

[4] 10. Claims for failure to comply with covenants of the City lease respecting property of Metropolitan lessor lines which went out of the system during receivership. Of these the Second Avenue line is a type. This line was leased to the Metropolitan before the whole system was leased to the City Company. The Court of Appeals has held that by these two leases the relations established were: Lessor, Second Avenue Company; lessee, Metropolitan; assignee, City Company. That court also held that the lessor was entitled to judgment in the amount of nearly $850,000 against both lessee and assignee, and could collect the amount out of either or both. Under such circumstances, the assignee is primarily liable to the lessor, and the lessee is surety for the discharge of the assignee's obligation. If both defendants were solvent, and the lessor collected the judgment from the assignee, that would end the matter; if it collected the $850,000 from the lessee (the surety), the latter could recover over against the assignee; if it collected $425,000 out of each, the lessee could recover the $425,000 which it thus paid from the assignee. In other words, the surety would recover from the assignee only what the lessor had taken from it. It is thought that the insolvency of both lessee and assignee does not alter the situation. Out of the estate of the assignee, the lessor will collect what it can. Of the balance still due, it will collect what it can out of the estate of the lessee. For the amount thus taken from the estate of the surety, such estate will have a claim against the estate of the principal. It is suggested that a contrary ruling was made in the decisions of this court and the Court of Appeals touching a judgment obtained by the city of New York against the Central Park Company for paving. Apparently such ruling was made by affirming findings and conclusions of the special master, but the point was not discussed in the opinions; the amount involved was quite small; and it is thought now that the true rule is the one above set forth. Although

the amount be not "certain," it may be mathematically made certain. The claims in this item are allowed at the amounts which the estate of Metropolitan will pay to lessors on final settlement. In all other respects the findings on these items are affirmed.

11. The special master's allowance of $63,821.78, as a set-off, being the amount expended by the City Company prior to September 24, 1907, in restoring buildings destroyed by fire, is overruled. The allowance of the Metropolitan's claim on such buildings is only for restoring them from the condition they were in on that date. The expenditure of the sum named has reduced the amount of the claim. To allow the same sum as a set-off would be a double payment.

12. I fully concur in the special master's opinion, findings, and conclusion as to set-off of the improvement notes of the Metropolitan Company. Also in his disposition of the application for a ruling as to the rights of the Farmers' Loan & Trust Company to receive or share in the proceeds of the present claim.

## Inter-Receivership Accounting.

On exceptions to report of special master in the matter of petition of the receiver of City Railway Company for an accounting by the receiver of Metropolitan Street Railway Company for cash and other property.

LACOMBE, Circuit Judge. As the decision of this application is of interest only to parties interested, who are already familiar with the details of the situation, this court will merely indicate briefly the disposition made of the various objections to the report, which have been argued here.

1. As to the two items of scrap (conclusions of law Nos. 6 and 7 in the report), the master's conclusion as to the first item is affirmed. The property that was sold, scrap from a demolished building belonging to the Metropolitan, belonged also to the Metropolitan. Destruction of the building did not divest the title. When the City Company sold the scrap, it sold property of the Metropolitan and should account to the owner for the proceeds. As to No. 7, the copper wire scrap recovered from the ruins of the car barn at 146th street and Lenox avenue, which was destroyed by fire. It is thought that the mere circumstance that the lease required the lessee (City Company) to rebuild in the event of destruction by fire would not divest the title to what was left of the res. The lessee did not restore the building. Receivers expended a large sum of money in doing so. I am not sufficiently familiar with the details of construction to concede the contention that this wire was personal property of the City Company, not a fixture and not a part of the building. There is no testimony that the wire belongs to the City Company. It may well be assumed, in the absence of proof, that it was an essential part of the structure, necessary to its operation as a car barn, and installed there when the Metropolitan originally constructed the building. There seems to be no sound distinction between these two varieties of scrap. Conclusion 7 of the report is reversed.

2. As to payments made to receivers by the so-called "controlled companies," conclusions 9, 10, and 11 of the report.

(A) The Forty-Second Street Company made three payments to receivers:

| | |
|---|---:|
| September 25, 1907 | $125,000 |
| November 29, 1907 | 19,694 |
| January 17, 1908 | 25,000 |
| | $169,694 |

The special master allowed the claim of the City Company for this full amount.

The payment of September 25, 1907, was made without any specific directions as to the application of it by the debtor, merely "on account." At this time the receivers had inter alia three things to do: To collect moneys due to the City Company, to collect moneys due to the Metropolitan Company, and to run all the roads in the system, including the controlled roads. To keep the controlled roads running called for continual advances to them of materials, labor, and power; without such advances a controlled road was at any time likely to cease rendering service to the public. At this time receivers were in great straits for money with which to provide such advances, and it was right and proper for them to apply any money, which came to them from a controlled road, without designation by the debtor of its application, to their reimbursement for materials, etc., which they, as operating receivers, had furnished in order to keep such controlled road in public service. Indeed, it might well be held that it was their duty to make such application. Had they at the time made an entry in the books to the effect that they appropriated this payment by a company, which was debtor both to themselves as operating receivers and also to the estate of the City Company in their hands as receivers, to the latter's estate, a very strong argument might be advanced for disregarding such appropriation of payment, as being one which they should not have made. However, that argument need not now be considered, so far as the evidence shows no such appropriation to any debt due the estate of the City Company was made at the time, it was merely credited on the cash book to the open account of receivers with the Forty-Second Company. That being so, no subsequent bookkeeping, alteration of entries, or filing of claims would change the situation.

It is not intended, however, to apply this reasoning to anything, except existing indebtedness, although in the past the controlled company had sometimes paid in advance for materials, power, etc., to be thereafter furnished. So much, therefore, of this $125,000 as represents indebtedness for materials, power, etc., advanced by the operating receivers from their appointment to the date of payment, should not be allowed to the City Company. For the balance only the special master's conclusion is affirmed.

The payment of January 27, 1908, $25,000, to "Joline and Robinson, receivers of New York City Railway Company." The special master interprets this phrase as an instruction by the debtor to appropriate the money, otherwise than in payment of obligations due direct to the receivers. This gives undue weight to the word "City," which is of no

more significance than the word "receivers." "Receivers of the New York City Company" was the usual short and convenient title by which the receivers were identified. No one at that time was particular, in speech or writing, to set forth the dual capacity in which, from the outset, the court indicated they should act. Whatever they were called, they acted as receivers of the estates of both companies and as operating receivers as well. If, at the time this payment was made, the Forty-Second Street Company owed receivers as much as $25,000 for materials, labor, and power, the allowance of any part of this item to the City Company is reversed. If it owed less, the conclusion will be modified accordingly.

The payment of November 29, 1907, was made by the debtor expressly for payment of accrued interest on the notes held by the City Company. As to that $19,694.40, the conclusion in the report is affirmed.

(B) In accordance with the views above expressed, the special master's allowance to the City Company of the $6,530.67 paid by the Dry Dock Company is allowed.

(C) And the allowances of the payments of $55,000 by Union Railway Company are disallowed.

3. As to the allowance to the City Company of the $14,901 collected from the Bridge Operating Company, the conclusion should be reversed, if it were shown by competent proof that such sum was included in the settlement of April 30, 1907, between the Metropolitan and City Companies. But the proof is not persuasive, except as to $500 of it. Conclusion No. 8 of the report is therefore affirmed, except as to such $500.

4. The reduction of the item (conclusion No. 15) for payments to employés from $127,980.10 to $120,980.10 is reversed. The items making up the difference, salaries, physician's fees as witnesses, etc., while not technically "pay roll" payments, come fairly within the sound discretion, which in cases such as this, involving many complications, must be accorded to receivers.

Some of the items originally discussed in the briefs have since been disposed of by mutual concessions. As to all the others, the conclusions of the special master are affirmed.